Good morning, ladies and gentlemen. Our first case for argument this morning is Scalin v. SNCF Mobilité. Mr. Krogh. Thank you. Good morning, Your Honors. May it please the Court. When Congress enacted the Foreign Sovereign Immunities Act in 1976, it clearly intended that claims for expropriation in violation of international law could be heard in a federal forum, despite that clear intent. Well, it provided that they can be heard if the conditions of 1605A3 are met and if there is a substantive claim for relief. One of the things that puzzles me about this case is that everybody seems to want to address extra statutory defenses ahead of the statutory ones. So I would be interested if you could tell me why the actual written words of 1605A3 have been satisfied. Certainly not. So the statutory text has a few different requirements. Only one of them was disputed below, and that's the requirement that there be a taking of property and then also the continued use of that property or substitute property by the foreign sovereign. That issue wasn't disputed. No, that's not everything. It says such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state, or that property or any property exchanged for such property, etc., etc., is engaged in a commercial activity in the United States. I have significant doubt that those conditions are satisfied. Right, so the first portion of what you just read back is not applicable to this case. That's the standard that governs claims against sovereign themselves. The portion of that standard that governs here is the second half of that, and that's the portion that addresses claims against sovereign instrumentalities like SNCF. For that standard, there is no requirement that the expropriated property be present in the United States. The only requirement is that the instrumentality be engaged in some sort of commercial activity with a sufficient connection to the United States, and that the instrumentality have taken the property and continue to hold that property or substitute property regardless of the location. So that's a different standard. And so that poses at least two questions. One is whether any property traceable to the stolen property can be found. I don't see anything in your briefs about tracing. And second, whether SNCF Mobilité is engaged in a commercial activity in the United States. Yes, and so on the first issue, that really is the question that was squarely addressed by Avales. So the Court's not writing on it. Excuse me. You're going to have to address the Court rather than speak down into your papers. I'm sorry. I was just looking for the relevant quotation, Your Honor. In the Avales case, the exact same argument was made because there, too, the plaintiffs argued that although the respondent in that case continued to hold the property, they could not identify what specific substitute property may still have been there. Nonetheless, in that case, this Court held that at the pleading stage, it's sufficient to make a general allegation that the respondent instrumentality is continuing to use the property or substitute property. I'm not worried about just at the pleading stage. The question I asked was shouldn't the federal court resolve the textual requirements of the statute before moving to extra-textual requirements, if any? Pleading something is not the same thing as resolving the actual requirements of the statute. But I understand there's been a problem because the district court jumped ahead to extra-textual things. But maybe what should happen is we should tell the district court, resolve all the textual things before thinking about extra-textual things. Then we have the second, the next question, commercial activity in the United States. And your reply brief says, well, SNCF is engaged in commercial activity in the United States because you can buy URail passes to travel on it. And you cite a few district court opinions about that subject. I found that very curious because that very issue came to the Supreme Court of the United States in OBB Pursuit and Verkehr. And two years ago, by a vote of nine to nothing, it rejected that line of argument. So your brief relies on district court opinions from the 90s and ignores a Supreme Court opinion from 2016. Needless to say, that raises red flags in a judge's head. I do appreciate the potential relevance of the Austrian case, Your Honor. I do think this court's Avales decision is still instructive on that, though, too, because in that case addressed what the threshold is. Not only did Avales, if that's the right way to pronounce it, precede OBB Pursuit and Verkehr by four years, but decisions of the Supreme Court trump those of the Seventh Circuit. It seems to me we have to deal with the law as it's been interpreted by the Supreme Court. And that's a decision under the Foreign Sovereign Immunities Act about what it means to be doing business in the United States. I don't see how you can ignore it. And we certainly won't ignore it. Certainly, Your Honor. I do not believe that that Supreme Court decision, though, addressed the question of jurisdictional discovery, which was the topic that this court addressed in Avales. And what it said, that in a situation where a plaintiff shows at least documentary evidence raising a question about whether the Foreign Sovereign itself is engaged in commercial activity in the United States by, for example, selling services or goods over the Internet or otherwise, The holding of the Supreme Court is that if established beyond any doubt, is not doing business in the United States. You don't need discovery to show something that, if shown, the Supreme Court says is not within the scope of the Foreign Sovereign Immunities Act. I don't read the Supreme Court's decision as foreclosing the idea that any commercial conduct by a foreign railway in terms of selling goods or services into the United States is insufficient. It rejected the claim in the particular record of that case. Look, the Supreme Court does not grant certiorari to resolve issues related to the record of particular cases. It established a rule of law. You can't say that case involved the Austrian State Railroad, whereas this case involves the French State Railroad. The legal principles are what they are. I take your point, Your Honor. I'm not making an argument that it matters which particular country's railroad it is. The argument I am making is that, on this record, we do not know exactly what the nature of the SNCF's activities in the United States are. We have alleged facts sufficient to warrant jurisdiction. You have alleged two things. One, that they maintain a website. And two, that you can buy a Eurail pass, good for travel, on the French Railroad. Now, the second of those, the Supreme Court has said, as a matter of law, is insufficient. The first of those, they maintain a website in the United States. We get those kinds of cases all the time, and we routinely hold that the fact that Company A maintains a website that can be accessed in Illinois is not doing business in Illinois. You don't need discovery to know that that is a legal principle. What we do need to know is whether there is any other way to argue that despite those legal principles, SNCF is doing business in the United States. Right, so to clarify the theory of the complaint, it's not our position that merely having a website qualifies under the statute. The relevant provisions of the allegations of the complaint are, one, they sell tickets in the United States through their website, and two, they engage in business through other entities in the United States acting as their agents. And so that is an agency theory of liability. We do not view the Supreme Court's... And do you think any of those agency theories of liability would suffice to show general jurisdiction? Right, the Supreme Court, this is, again, something completely missing from your briefs, and the complaint, for that matter. The Supreme Court has insisted on the distinction between general jurisdiction, something sufficient to subject the whole business operation of something, to domestic law of some jurisdiction, and particular jurisdiction, that is, something that went wrong in the transaction that was negotiated. And we've drawn that very distinction for website cases. If you make a transaction over the website, there's jurisdiction about that transaction, but not about the whole business. Those cases, Your Honor, involve the due process standards that govern claims against private parties. This court in Abilene explicitly rejected the argument that those due process standards apply to a sovereign-owned instrumentality, and the court held that in that case, because foreign sovereigns are not persons for purposes of the due process clause, the standard that matters is only the one set forth in... I'm not asking about the Constitution. I certainly didn't mention it. That is a distinction for purposes of figuring out whether somebody is subject to specific or general jurisdiction. You can locate that wherever you want. What I'm saying is that standard, that distinction doesn't get located anywhere in the context of sovereign claims, because the due process and the minimum context standard in claims against foreign sovereigns is exclusively the standard set forth in the Foreign Sovereign Immunities Act. The same argument was rejected in Abilene. We're going to ask for supplemental briefs. And if this is the line you take in your supplemental brief, you will lose. You really need to address the meaning of the words in the statute rather than just say, one or another constitutional test doesn't apply. I'm trying to figure out the meaning of the words in the statute. Right. And we would be happy to address this in a supplemental brief. For now, I'll just make the point that the statute does not distinguish between general jurisdiction and specific jurisdiction. It talks about engaged in a commercial activity in the United States. Right. If you have a decision of the Supreme Court that says, if you engage in commercial activity A, that suffices under 1605A3 or an equivalent provision to allow litigation about commercial activity B, by all means cite it. But if you don't, there may be problems. We have Seventh Circuit authority on that point, Your Honor. And again, I'm happy to address it in our brief. But the Abilene case really did address this. You will also want to address another post-Abilene decision by the Supreme Court, Kaya Belligan's Royal Dutch Petroleum, which said that the United States will not resolve on the merits controversies about activity that a foreign defendant committed abroad with respect to a foreign victim. That there is no substantive claim under U.S. law with respect to such things. And if I understand the claim here, it is that a foreign defendant committed a wrong in France with respect to people who were not U.S. nationals. And under Kaya Bell, it looks like there is no substantive claim. So, Your Honor, Kaya Bell addressed claims under the Alien Tort Statute. And that's a statute where there's no clear indication. Kaya Bell is an application of the principle that U.S. law does not apply extraterritorially. That's a principle that can be overcome in the case that there's a statutory indication that Congress intended extraterritorial application, which there is here. I'm doing my best to tell you what you need to address. If you want to address something else, that's up to you. But 1605A3 lifts a sovereign immunity defense under specified circumstances. It does not create a right of action. You need something creating the right of action. I have much trouble understanding what that might be other than the Alien Tort Statute. But if you have something that creates the right of action, and it's not 1605A3, please let us know. That's the Alien Tort Statute theory. It doesn't work after Kaya Bell because this is a triple foreign case. Foreign defendant, foreign activity, foreign victim. That's the way international law gets enforced in U.S. courts. There isn't any common law Alien Tort Statute. And if there were, it would be dead after Kaya Bell. I'm trying my best to make you see the problems. You're going to need to discuss them. Counts 2 and 3 are common law state law claims for conversion and unjust enrichment. Nothing in Kaya Bell sheds any light on that. And in fact, numerous cases after Kaya Bell have recognized that the presumption of interpretation applicable to a federal congressional statute doesn't speak to the scope of common law claims placed under state law. You think state law has more extra-territorial and extra-national application than federal law? It can, because it's not subject to the same presumption of interpretation that applies to a federal statute. So although the United States can't rule the world, Illinois can. That seems extremely unlikely. When Congress enacted Section 1605A3, it clearly intended to create a forum for claims of expropriation by foreign sovereigns. And the run of the mill case is going to be a forum. 1605A3 says that the defense in this act doesn't apply to something. It does not create a right to action. If we can't agree on that, I think we can't agree on what the English language means. Your Honor, creating that immunity exception would have been an empty gesture if no plaintiff could bring a claim for expropriation because of the presumption against extra-territoriality. Back in 1976, long before Kyle Battle, some courts, including the DC Circuit, had held that things like this were indeed actionable. Since then, the Supreme Court has said you're wrong. Now, that may pull the rug out from under an assumption of 1605A3, but it doesn't pull the rug out from any of the language. If it drains that provision of all practical effect and that no one can ever bring a claim subject to that exception, then I think that that raises some serious problems. That may be the consequence of Kyle Battle, but that's, well, classified above our grade level. Respectfully, Your Honor, I don't think there's anything in Kiobel or any other decision that requires this course to read out of the statutes an immunity exception that Congress passed with a clear expectation. Look, it's an immunity section. It does not create the right of action. It does not. Okay, you've got five minutes left. I will stop annoying you. Your Honor, may I turn to the exhaustion issues that were the basis for the district court decision? Go ahead. We would ask that this court reconsider its decisions in Avales and Fisher on that point because there have been significant developments in the law since those cases were decided. First of all, the D.C. Circus, in two decisions now, has recognized that the reasoning underpinning those decisions rests on a mistaken interpretation of the third restatement. That's an interpretation that the other side doesn't defend. The United States admits is wrong. The restatement reporters citing their side doesn't defend. It relied on a rule that a plaintiff cannot bring an expropriation claim unless it can convincingly show that foreign remedies are clearly inadequate or a sham. And that language is verbatim from Section 713 of the third restatement. As everyone points out, including the United States, that is a provision that only governs international law proceedings. And there's a reason for that because in an international law proceeding, there is no preclusion rule that would prevent you, after you've exhausted the claim, from getting plenary review in the international court. But when you apply that rule to a case like this, it's not functioning as an exhaustion rule because if we go to France, I guarantee they're going to argue that whatever decision is made in France gets given preclusive effects in this proceeding. But preclusion isn't absolute. There are a number of exceptions to preclusion that can get you out from underneath the preclusive effect. Why wouldn't one of those exceptions save you here? Because those exceptions are very narrow, Your Honor. For example, there's a public policy exception, but that's been interpreted uniformly by the courts to be extremely narrow and to apply only when something violates fundamental notions of what is decent and just under United States policy. And the majority of times, there's a strong presumption in favor of recognizing a foreign judgment. And so if you require exhaustion of claims like this, as a practical matter, that means you're out of court. And this was the point the D.C. Circuit made just last month in the Simon case, and I think it's a valid one. If you require exhaustion of these claims, what you are effectively doing is dismissing these claims in favor of litigation somewhere else. There's no need... I want to ask you a separate question. Take Abelez and Fisher, just for purposes of my question, as good law. Okay? What are the one or two most significant deficiencies with the claims tribunal, the CIVS, as you see them? What are the top two? The major one, I would say, are the very substantial questions about whether the CIVS can even hear claims for expropriation by SNCF, as opposed to expropriations by the French and German authorities. The enabling decree of the CIVS specifically says that its jurisdiction covers only claims pursuant to anti-Semitic legislation for expropriations affected by the Vichy or German authorities. It says nothing about expropriations by a trained company. To you, is what you just said consistent with the affidavit that your adversaries submitted? No, it's directly contrary to that affidavit. And that brings my next point, which is that in addition to that decree, in addition to the other documentary evidence we submitted, the respondents came in with an uncorroborated affidavit from an interested witness, and then the district court relied on that completely, with no corroborating support, and then said, oh, I don't think there's any need for discovery here because how would that aid the analysis? That was not a permissible exercise of the district court's discretion in terms of jurisdictional discovery. We pointed to the decree. We pointed to the annual reports, which, contrary to the district court, clearly set out six categories of damages covered, and they don't include trained expropriations. We pointed to the fact that under the CIVS rules, it can't even consult the archives of the SNCF, and we pointed to the undisputed fact that in 28,000 cases, there's never been a single instance where the CIVS has awarded compensation for a trained expropriation, and the district court gave all that the back of its hand and said, well, here comes somebody with a declaration with no corroboration whatsoever. I'm going to credit that instead, and we would say that that is beyond a permissible exercise of discretion to rely on an uncorroborated affidavit and not even give us the chance to test that affidavit and test those allegations through the discovery process, so even if this court does not want to revisit what it said in Avales and Fisher, that's a sufficient basis to remand for discovery on that key issue, and on that discovery point, too, I think Avales is right on point because there it was on a slightly different issue. It was on the commercial activity aspect of the case, but the court said that the plaintiff there had pointed to some allegations, some factual allegations that there was commercial activity in the United States. The defendant came in with an uncorroborated affidavit from one of its officers saying, no, we didn't do that, and this court said the district court on remand must allow jurisdictional discovery to test that affidavit, and if that was an instruction for something the district court to do on remand, the implication is that the court would have abused its discretion by not doing it, and by the same token, in this case, where our documentary evidence was even stronger, the court should have allowed us to test the allegation here. If the district court had allowed discovery, if we'd had a chance to test what the chairman of the CIV had made these claims in the teeth of what his own enabling decrees is, and the district court nonetheless decided to credit that evidence, then that might be a different case, but in a case like this where the district court didn't even give us the basic tools to test the allegations that the chairman of the commission was making, that was just not a permissible exercise of its discretion. Your Honor, if I'll reserve the rest of my time for rebuttal at this point.  so I will give you five extra minutes for rebuttal. I appreciate that, Your Honor. Mr. Bellinger. May it please the court. I'm John Bellinger, counsel for SNCF, the French National Railroad. The district court properly dismissed this case relying on this court's decisions in Abeles and Fisher because the plaintiffs had not first applied to the French government commission called CIVS, which was specifically created... Called what? CIVS, that's the... I assume you're trying to pronounce that four-letter initialism, which does not have a pronunciation in any language with which I'm familiar. I was going to struggle with it, Your Honor. Why don't you just call it the commission? I will do that. Very good. Anyway, the French government commission that was specifically created by the French government with the support of the US government to pay claims by individuals whose property was taken in France during the Holocaust. Now, to be clear, SNCF does not dispute that the plaintiffs or their relatives deserve to be compensated for property that was taken from family members during the Holocaust, during that dark period of time. Nor is SNCF disputing the factual allegations that the plaintiffs have made, even though the consensus of historians is that property was not taken from deported victims by SNCF employees, but rather by German authorities or by French gendarmes. Because the key issue here is not whether the plaintiffs or their relatives deserve compensation. They do. The question is where they should seek it, and that place is in France, not from US courts. So the district court did not just abuse her discretion in finding that the commission is an adequate and available forum. She relied on two sworn affidavits of the chairman of the commission on a statement of interest by the US government and by an amicus brief filed by the leading organization of French Jewish groups representing more than 60 Jewish organizations in France. And she reached the same conclusion that the Southern District of New York reached in 2008 in dismissing a virtually identical complaint. So this decision is squarely controlled by this court's decision in Avales and Fisher. It was binding on the district court, and she was required to apply it. As you know, in that case, this court said that victims of deportation in Hungary were required to exhaust their remedies before Hungarian courts, unless it could be showed that those remedies were clearly a sham or clearly inadequate or that their application would be unreasonably prolonged. And the district court properly applied those precedents. But the argument for exhaustion is... Mr. Bedford, can I ask you about a preliminary matter? Yes. You argue, do you not, in your brief, that the district court's September 2016 dismissal order, which was expressly without prejudice, should be treated as final for purposes of appellate jurisdiction under 1291? How can that be, though? I mean, what was there that indicated... And you're asking us to dismiss the appeal on that basis as untimely. Just by the terms of that minute entry, I mean, what was it that indicated that the matter was sufficiently final in the district court? Your Honour, we do believe that this case is governed by Judge Easterbrook's decision in Walker v. Weatherspoon. The facts are virtually identical. Except that this time the district court said dismissed without prejudice. But there was nothing to suggest that the complaint could be cured. She did not say... That's the problem, of course. The district court didn't release her opinion for a long time. So we don't know whether the problem could be cured or not because we don't know what the problem the district court had was. Well, that's right, Your Honour. We assume if it had been on an issue such as personal jurisdiction, she would have said in that minute order with a leave to amend rather than simply without prejudice. There was nothing to suggest that she was not dismissing the case fully. So at that point, we thought that the rule applies. As you said, in Weatherspoon, a judgment was deemed entered within 150 days and the plaintiffs had 30 days to appeal and they did not do so. So the appeal is untimely, at least under the Walker decision. Returning to exhaustion, it's important to note here that unlike the somewhat speculative remedies in the Hungarian courts, the argument for exhaustion is even more compelling here because the Commission has a... Counsel, let me come back to a different version of the question I was asking to Mr. Crye. The statute has got particular language in it and you are suggesting that instead of trying to implement the language of the statute, we do something else. You call the something else exhaustion. The United States would call the something else comedy. The ALI thinks comedy is probably a better term for it than exhaustion. But the question I have for you is why shouldn't we be doing what the statute says instead of doing something else? Well, Your Honor, we agree that the terms of the statute have not been satisfied and we argued that as our first argument in the district court and we argue it on appeal. We agree with the points that you made that there is no jurisdiction under the Foreign Sovereignties Act because... I didn't say that. I said I'm having a hard time seeing the argument for it. But the question I'm now asking you is one that comes straight out of Argentina against MLL, in ML capital, and it says don't add... You got a jurisdictional statute, don't add to it. Now, the justices have got a footnote that says, well, maybe comedy anyway. But if we're going to be carrying out the program of a jurisdictional statute, one would suppose we start with the jurisdictional statute rather than starting with judge-made doctrines. Well, two points there, Your Honor. One, the Supreme Court itself has said in Sinochem that it is appropriate for a district court to consider jurisdictional arguments in any order. We agree that there is not... To consider jurisdictional arguments in any order, surely. But exhaustion can't be a jurisdictional argument. It's not in the statute. Comedy is certainly not a jurisdictional argument. And whatever Ebelez and Fisher were talking about, I don't think they were talking about jurisdiction either because both of those decisions describe this exhaustion requirement as discretionary. Nothing about jurisdiction is discretionary. So they are non-jurisdictional reasons. They are judicial additions to a jurisdictional statute. And one wonders whether we shouldn't be starting where Congress told us to start. Well, with respect, Your Honor, I don't think that's necessary in this case. And that gets to the second point on NML capital. And you put your finger on it, and it was surprising that the D.C. Circuit inexplicably ignored in both the Simon and the Philip cases the Supreme Court's specific statement in NML capital. It said NML is a very narrow decision focused only on whether the FSIA applies to post-judgment discovery. And then it took pains to say in footnote 6 that, of course, other sources of law may apply. And if that wasn't clear enough, the Supreme Court went on to say, including considering comedy. And that's, of course, consistent with the canon of statutory construction, that when Congress legislates against a background of common law, that the common law is preserved unless Congress specifically says it isn't. So, for example, in the Verlinden case, the Supreme Court specifically said that the forum non-convenience would be likely preserved notwithstanding the FSIA. So in sum, we think, one, the D.C. Circuit was wrong to say that a court can only dismiss based on the grounds of the FSIA itself that these other background principles of common law, including forum non-international comedy, are preserved. And under the Supreme Court's decision in Sinekin, there's no reason that a court can't consider those issues first when, in fact, and it's particularly true here where there is clearly an adequate and available remedy. It's not... As the U.S. government said, it's clearly true that CIVS is an adequate and available forum. They have, in the 18 years of their existence, they have handed out more than $500 million in compensation, more than 35,000 recommendations for compensation. As the district court said, its procedures are likely preferable to the procedures here in courts in the United States. There's no statute of limitations. Unlike the statute of limitations here in Illinois, it applies a flexible standard of proof. In fact, two of the plaintiffs here, Ms. Picard and the father of another, have previously applied to CIVS and received generous compensation. They did not make a claim for property that was taken on SMCF trains and then did not appeal their rulings. Ms. Galen's father, in particular, received three times more than the amount that he had asked for, over $100,000 for him and his family. I want to address something that Mr. Cry said with respect to relying on the affidavit of the chairman of the commission, Mr. Michel Janotou, who is a retired French appellate judge, who unequivocally stated, not just in general terms, that CIVS is willing and able to hear these claims, but that these specific plaintiffs, in this case, may bring their claims to CIVS. And he said, and I quote, if items of the relatives of the plaintiffs were seized during the boarding of deportation trains or on these trains in French territory, CIVS is willing and competent to entertain these claims. You mean the commission? I'm sorry, you got me. Once people get sucked into the world of initialisms, it's hard to react. The district court also properly relied on an amicus brief filed by the leading organization of French Jews, and Judge Easterbrook, I'm going to get myself in trouble here because I was going to use the acronym. I will simply refer to it as the Representative Council. Thank you. Which said that it was particularly satisfied with the manner in which, and here I have to quote, the CIVS has conducted its work and believes that it has consistently provided fair and benevolent compensation. They did go farther to say that the consensus of historians based on survivor accounts is that SNCF did not take any property of deportees, that property would have been taken by German occupying authorities or French gendarmes. She also relied on a statement of interest by the U.S. government, which urged dismissal on four different grounds. Mr. Bellinger, can you react to the question Judge Easterbrook asked or just the topic he was getting into with respect to why the commercial nexus, address the commercial nexus aspect, whether as a pleading matter or otherwise in this case. In your view, I think it's not satisfied, right? Yet the French railway is doing business through a majority owned subsidiary, selling rail tickets in the United States. Why isn't that enough? At least under our case laws it stands right now. Your Honor, so one, I think the plaintiffs essentially concede that the SNCF itself, which is the entity that they're suing, is not doing business in the United States. The requirement of the statute is that you be engaged in commercial activities, which is a consistent pattern of business, and they don't even try to allege that. They point to these subsidiaries. But Rail Europe is a majority owned subsidiary, right? That's not disputed. Under this Court's decisions in Arch Holdings, the activities of a subsidiary should not be imputed to the parent unless it's clear that the parent is wholly directing and controlling those activities. You don't want to rely on the Seventh Circuit for that. That's the holding of the Supreme Court in the Mercedes-Benz case. Thank you. And that dealt with 100% owned subsidiary, and the Supreme Court said that cannot be imputed to the parent to have the United States rule on the validity of action that took place outside the borders of the United States. And we do agree that neither of those terms of the Foreign Sovereignties Act, either the commercial activity in the United States or the allegation of a taking and holding of the property have been satisfied. But, Your Honor, we don't think that supplemental briefing is necessary on these subjects because they were fully briefed below, and it's not... But they haven't been fully briefed here. They have not been fully briefed here. Nonetheless, we do think that the case in terms of, rather than sending it back to the district court or rebriefing, that to simply follow this court's decisions in Abeles and Fisher and requiring that the plaintiffs go back to the commission... Two of the plaintiffs have been before and apparently did not seek compensation for property allegedly taken on trains, but the chairman, Mr. Janito, has said that they can come back and can apply specifically for compensation and we think requiring that exhaustion is appropriate. I would note that that holding in Fisher and Abeles is consistent with what the Eleventh Circuit said in Angaro-Bonage versus Dresdner Bank, which also required dismissal on the basis of comedy so that the plaintiffs in that case would exhaust their remedies before a German commission. I see that the red light is on, Your Honor, so I will give the rest of my time to the U.S. government. Certainly, Counsel. Thank you, Your Honor. Mr. Yellen. Good morning, Your Honors. I'm Louis Yellen from the Department of Justice. I'm here today on behalf of the United States. Your Honors, I'd like to begin, if I may, by addressing Judge Easterbrook's ordering questions. Sinochem held that the court, a court, may decide to dismiss a case on any threshold ground, not requiring the court to address the merits of a claim. In Sinochem itself, the court approved the dismissal of the suit based on forum nonconvenience claims and said that that was an appropriate dismissal notwithstanding a jurisdictional question in the case. For that reason, we do believe that the court, if it chooses to do so, could resolve this case on the comedy grounds that the district court used to dismiss the case. And it's principally on that comedy question that the United States appears today here. Although, of course, that's not how the district court described its own decision. I think that's not entirely right, Your Honor. The district court used multiple descriptions, and it did, relying on Abelez and Fisher, did describe comedy as the basis for the requirement of exhaustion. And to be clear, Your Honor, the United States does think that exhaustion is part of the concept of comedy here. The reason why dismissal would be appropriate would be to allow plaintiffs in the first instance to present their claims to the commission, which the United States has a long and enduring commitment to as the exclusive forum for the resolution of material spoliation claims related to the atrocities committed during the Holocaust. We do believe that comedy, as a common law doctrine, is something that is consistent with the FSIA, as this court held in Fisher. We think that the Simon case, the recent D.C. Circuit decision, fundamentally erred in describing comedy as a new doctrine of immunity. It's neither new, nor is it a doctrine of immunity. The Hilton v. Galliot case from 1895 recognized adjudicatory comedy as a ground on which a court in this country may dismiss a case that is a prudential federal common law doctrine. It's not a principle of international law, although it may be informed by international practice, and it does not require as a mandatory matter dismissal. It is a prudential doctrine requiring a district court to undertake a balancing of various factors, principally the interests of the United States, the interests of the foreign government, and the adequacy and availability of a remedy in the foreign state. We think it is quite clear in this case that the interests of the United States and France support dismissal in favor of adjudication by the Commission, and we also believe that the Commission has more than adequate mechanisms in place to properly consider claims of this sort. In fact, for the reasons stated in the Eisenstadt Declaration, which we include as an addendum to our brief, and for the Junotau declarations, we think that that forum very likely is a superior forum than adjudication in a U.S. court. It has relaxed standards of evidence. There is assistance provided by Commission staff researching in specialized archives to discover evidence to support claims. There is no compulsory process required for compensation if a claim is recognized, and the process as a general matter takes significantly less time on average. The CIBS website, I want to be clear, I'm not sure if this is in the record, but the CIBS website, of which this court can take judicial notice, mentions that the average claim is adjudicated in under two years. I'd like to be able to respond to any questions the court might have about the government's suggestions concerning the understanding of international comity as a federal domestic common law doctrine as opposed to a requirement of international law. If not, I'm happy to rest. Thank you, Your Honors. Thank you, Counsel. Mr. Cry. Your Honor, I wanted to start on the Sachs case that you mentioned. Sachs was brought under 1605A2 of the Foreign Sovereign Immunities Act, the commercial activities exception. That provision includes an express requirement that the claim be based upon the commercial activity, and the question Sachs addressed is what does a plaintiff have to show to show that his claim is based upon commercial activity. This case is brought under 1605A3. There is no based upon requirement in that statute with respect to instrumentality, so Sachs says nothing at all that affects this court's existing precedent. Avales did address this precise issue, and Avales said that, effectively, the same showing that we make here is sufficient at this stage to allow a case to go forward. I want to be clear, too. We did not concede that SNC itself did not sell tickets into the United States. Quite the contrary, we argued that it did. But even if the only thing you look at is the activities of SNCF subsidiaries, if those subsidiaries are doing things in the United States for the benefit of SNCF... I mentioned the Mercedes-Benz case. Its technical name is Daimler AG against Bauman... Yes, Your Honor. ...in 2014. And it said you can't use the activities of a subsidiary to assert jurisdiction over a foreign corporation dealing with foreign acts. Not on the basis of an alter-ego theory, unless you can make an alter-ego showing, but there's a difference, Your Honor, in situations where the subsidiary... I don't think... Well, you'll have a chance to file supplemental briefs. But trying to dismiss Supreme Court decisions on the ground that they didn't use the precise form of words that we're using, so ignore the general principles in them, is not a successful litigation strategy. And that's not what I'm doing here, Your Honor. But Supreme Court decisions only address the issues they address. The Daimler case did speak to the general question of whether a subsidiary's contacts can automatically be imputed to its parent. That's not what we're arguing. That wasn't the holding of the case, either. It's not whether the subsidiary's contacts can be imputed to its parents. It's whether the fact that a subsidiary is doing business in the United States allows relief against the parent for activities outside the United States. That's the question. And as a general matter, that's one thing, but if a subsidiary is doing actions in the United States for the benefit of its parent, acting as its agent, then you have an agency relationship. And that's not what Daimler addressed, Your Honor. And I'm happy to brief that issue. We will certainly entertain any argument you care to make about that. I'd like to turn next to the NML footnote, because I think this is very telling, Your Honor. What that footnote states is that although there's no immunity from discovery, the court referred to settled doctrines of privilege and the discretionary determination by the district court whether the discovery is warranted, which may appropriately consider comedy interests. So that court was talking about situations where a district court already has discretion to do something or something else, and it's just saying in making that existing discretionary determination, the court can consider comedy interests. That is miles away from saying that you have a statute that clearly gives expressed jurisdiction over this type of claim, but a district court can nonetheless, just based on a freestanding comedy doctrine, dismiss in favor of a foreign forum. So NML's footnote really just does not support the other side at all. The next issue I wanted to talk to is the DOJ's position. Because they, you know, the DOJ, at the end of their brief, they say you should affirm, but there is nothing in that brief that remotely supports affirming the decision here. At best, they are arguing for a remand, because the standard they advocate, this multi-factor balancing where you consider the interests of the sovereigns, where you consider various other interests, sort of like what the 11th Circuit did in the Angara-Banagas case, that is not what the district court did here. The district court applied this court's standard under which the only thing that matters is has the plaintiff shown convincingly that the foreign forum is clearly a sham or inadequate. And that was the standard from section 713F of the third restatement, that nobody is defending here. So if this court is inclined to adopt the DOJ's position, we don't think it should, because we think the D.C. Circuit has the better view, but if the court is inclined to adopt the DOJ's position that there should be some free-floating comedy based on a multi-factor balancing test, that is not a basis for affirming the district court's decision here. By the way, do you know what's going on in Phillip? A petition for re-hearing on Bonk has been filed, and I gather not acted on. Have they called for briefs or something else from the parties? So in Phillip, a response to the petition was ordered, and that's been filed, and no further action has been taken on that for a couple of months. And it was filed last October, so it's been pending for a little while. Yes, and in Simon there's also a petition for re-hearing that's been filed. The court hasn't called for a response yet or otherwise acted on that petition. One other authority I just wanted to mention too, and that's the restatement. We focused on section 455 in our brief, but the fourth restatement, section 424, has a very important discussion on whether there is a free-floating international comedy doctrine that allows you to dismiss in favor of a mere potential forum abroad. And as that section points out, there are well-settled doctrines of comedy that, say, U.S. courts can give comedy to foreign judgments. Some courts have also said you can give comedy to an ongoing foreign proceeding. But there is no well-settled doctrine that says a court can dismiss on comedy grounds merely because a court case could have been brought somewhere else. And really the 11th Circuit and the 9th Circuit cases that they cite are the only two cases that have ever done that. And the reason why that's not totally surprising is that there already is a doctrine addressing precisely that kind of issue, and it's forum nonconvenience. What the Justice Department is proposing here is basically a standard that lets foreign sovereigns get forum nonconvenience dismissals without having to show any of the requirements for that doctrine. There's no interest balancing at all under their standard for the adequacy of the foreign forum. Instead of the defendant having to show an adequate forum, the burden is flipped, and the plaintiff has to show by clear and convincing evidence that the forum is inadequate. And then there's also no strong presumption in favor of the plaintiff's chosen forum. So they are basically proposing comedy as a forum nonconvenience on steroids doctrine, where foreign sovereigns can get this type of case, which Congress clearly intended, presumptively, to be heard in federal court, and allow those kinds of cases to routinely be dismissed, and forcing plaintiffs to pursue their remedies in front of the very government's courts that's accused of expropriating their property. That's not what Congress intended. There's no well-settled doctrine of comedy that permits that approach, and we submit that as the D.C. Circuit held, it's just contrary to what Congress intended when it enacted this exception to the Foreign Sovereign Immunities Act. Thank you, Your Honors. Thank you very much. The Court would like the parties to file supplemental briefs addressing two general kinds of questions. One is whether there is a substantive tort claim in this case. That's the general subject of Kyle Bell, of Jesner, under the Alien Tort Statute. And with respect to Illinois common law, whether there is any decision by the Supreme Court of Illinois asserting common law universal jurisdiction so that Illinois can judge the propriety that a foreign nation takes within its own territory. The second general set of questions is whether the standards of 1605A3, just in the text, have been met. And that requires a discussion of at least OBB Persona in Verker, Daimler AG against Baumann, and the distinction between general and specific jurisdiction. This is obviously a large undertaking, so we'll give you 28 days. Parties' briefs should be filed simultaneously. Do you have the page limit in mind? No. You discuss it as seems appropriate. We're asking you to do more work. We're not going to try to put a halter on you at the same time. Okay? When those have been received, the case will be taken under advisement, and all counsel have our thanks.